DECISION
{¶ 1} In this original action, relator, Sharon S. Bray, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying her permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
 {¶ 2} Relator was employed by respondent, Hamilton Fixture Company, as a carpenter assembler from April 1986 to July 1997. Relator's claim arises from an injury suffered on May 30, 1997. A claim was allowed for "sprain of wrist, right; sprain right hip; sprain lumbosacral; adjustment disorder with depressed mood." She was assigned claim number 97-408952 and awarded temporary total disability ("TTD") compensation.
 {¶ 3} At the request of the Ohio Bureau of Workers' Compensation ("BWC"), relator underwent a psychological exam by Chris H. Modrall, Ph.D., on August 20, 2001. At that time, Dr. Modrall opined that relator's psychological condition in claim number 97-408952 had reached maximum medical improvement ("MMI"). Dr. Modrall further noted that he believed relator could return to work from a psychological standpoint. Dr. Modrall stated that "it would be advisable to return [her to] work on a staggered basis. She might work for a few hours the first week, one-half a day the next week and then return full-time, rather than to return full-time on her first day."
 {¶ 4} Following Dr. Modrall's report, the BWC moved to terminate relator's TTD compensation. A district hearing officer ("DHO") granted the motion to terminate TTD compensation on October 15, 2001.
 {¶ 5} Relator filed an application for PTD compensation on August 1, 2002. Relator also submitted a report from her psychiatrist, Thor Tangvald, M.D. Dr. Tangvald opined that, based upon relator's inability to maintain mental stability and a diagnosis of major depression and generalized anxiety disorder, relator was unable to return to employment and should be found permanently and totally disabled.
 {¶ 6} At the commission's request, relator underwent a physical examination by Ron M. Koppenhoefer, M.D., on October 18, 2002. Dr. Koppenhoefer opined that relator could perform sedentary or light-duty work based upon the allowed physical conditions. Dr. Koppenhoefer noted that "[relator] does have depression, which could interfere with her ability to work. This is being looked into with an additional examination."
 {¶ 7} Relator was examined by psychiatrist, Donald L. Brown, M.D., at the request of the commission on November 5, 2002. Dr. Brown concluded that relator had reached MMI for her allowed psychological condition and assessed her level of impairment at 30-33 percent. Based upon his analysis, Dr. Brown believed relator could return to her former position as a carpenter assembler and could perform sustained remunerative employment.[1]
 {¶ 8} Pursuant to a request by the commission, vocational expert, Howard L. Caston, Ph.D., submitted an employability assessment report dated December 20, 2002. Basing his assessment on the reports of Drs. Modrall, Brown and Koppenhoefer, Dr. Caston submitted a list of employment options he believed relator could perform immediately. Dr. Caston further opined that relator's age would not affect her capacity to function; that relator's education was favorable for entry level, sedentary and light employment; and that relator had gained useful skills from her work history that would transfer into sedentary and light-duty employment.[2]
 {¶ 9} A hearing was conducted by a staff hearing officer ("SHO") on July 10, 2003. Based upon the reports submitted by Drs. Modrall, Koppenhoefer and Caston, the SHO issued an order denying relator's application for PTD compensation on September 10, 2003.
 {¶ 10} On August 8, 2005, relator filed a mandamus action with this court seeking to have the commission's order vacated and an order entered granting her PTD. Relator asserted that the commission erred in considering Dr. Modrall's report, which was submitted only for TTD determination. Relator further contended that the commission abused its discretion by not providing an explanation for relying upon Dr. Modrall's report and excluding others. Relator also objected to the commission's reliance upon Dr. Caston's vocational report, contending that the report was internally inconsistent with Dr. Caston's deposition.
 {¶ 11} Pursuant to Civ.R. 53(C) and Loc.R. 12(M), this matter was referred to a magistrate of this court. The magistrate rendered his decision on March 30, 2006, including findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate found that relator's reliance upon State ex rel.Kaska v. Indus. Comm. (1992), 63 Ohio St.3d 743, was misplaced. The magistrate held that, although Dr. Modrall's report was submitted for relator's claim for TTD, the report could also be considered in her claim for PTD. The magistrate further held that relator's argument that the commission must explain why it relied on Dr. Modrall's report over others lacks merit and is contrary to case law set forth in State ex rel. Bell v. Indus. Comm.
(1995), 72 Ohio St.3d 575. The commission must only provide a brief explanation of its reasoning pursuant to State ex rel.Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203. The magistrate correctly noted that it is the duty of the commission, not the court, to weigh the evidence presented before it.
 {¶ 12} The magistrate concluded that the commission did not abuse its discretion when it relied on Dr. Caston's vocational report. The magistrate noted that Dr. Caston properly rendered a vocational opinion pursuant to each physical and psychological report he relied on. The magistrate determined that the deposition testimony in question improperly asked Dr. Caston to issue a medical opinion and, therefore, was not internally inconsistent. Accordingly, the magistrate recommended that this court deny relator's request for a writ of mandamus.
 {¶ 13} Relator filed her objections to the magistrate's decision on March 30, 2006, asserting essentially the same arguments as those briefed and submitted to the magistrate. More specifically, relator again contended that the commission's reliance upon Dr. Modrall's report violated the Supreme Court of Ohio's holding in Kaska and that the commission was, therefore, required to explain its reasoning for relying upon Dr. Modrall's report to the exclusion of others. Relator also again objected to Dr. Caston's report on the grounds that it was internally inconsistent.
 {¶ 14} We agree with the magistrate's decision that relator's reliance upon Kaska is erroneous. In Kaska, the claimant was initially awarded permanent partial disability ("PPD") compensation. Six years later, claimant applied for TTD compensation. The commission denied claimant's application after reviewing reports of doctors which were submitted for claimant's original PPD claim. Upon appeal to this court, we indicated that a previous award of PPD cannot automatically preclude an award of TTD. The Supreme Court of Ohio affirmed this court's decision and went on to hold that, when reviewing claims for PPD and TTD, the element of permanency is relevant for different purposes. In a claim for PPD, the permanency of claimant's condition is a prerequisite for awarding compensation. In a TTD claim, the permanency of claimant's condition results in the termination of TTD compensation. See Kaska, supra; State ex rel. Ramirez v.Indus. Comm. (1982), 69 Ohio St.2d 630; Vulcan Materials Co. v.Indus. Comm. (1986), 25 Ohio St.3d 31.
 {¶ 15} We construe Kaska narrowly and find that it does not stand for the blanket proposition that examinations for one category of compensation may not be used when determining another category of compensation. Instead, Kaska simply distinguishes between the interpretations of "permanency" for PPD and TTD and emphasizes the importance that an award of one is not outcome determinative of an application for another.
 {¶ 16} We find the issues presented in Kaska are not present in the facts herein. The commission in this case did not base its denial of PTD on a previous award of TTD compensation. The commission relied on Dr. Modrall's report, which specifically stated that relator had: (1) "reached maximum medical improvement"; and (2) that Dr. Modrall "believe[d] that [relator] could return to work from a purely psychological standpoint." Although a finding of MMI indicates permanency of relator's condition, this finding does not serve to invoke Kaska. A finding of MMI also does not stand for the proposition that relator is permanently unable to return to some form of employment. The report relied upon by the commission effectively stated that relator's psychological condition had reached maximum improvement and was likely permanent. However, in light of that improvement, Dr. Modrall opined that she could return to work.
 {¶ 17} Additionally, Kaska dealt with PPD and TTD. Here, relator's claims were for PTD and TTD. Facts may arise in the future where it could be necessary to expand Kaska to applications for compensation other than PPD and TTD. However, those scenarios do not exist here. We decline to unnecessarily broaden the rule in Kaska. Accordingly, we find that the commission properly relied upon Dr. Modrall's report to support its denial of relator's application for compensation.
 {¶ 18} We find that the magistrate correctly held that the commission is not required to explain its reasoning for relying upon Dr. Modrall's report to the exclusion of others. Relator has provided no case law that requires any further explanation beyond the requirements of Noll and State ex rel. Mitchell v. Robbins Myers, Inc. (1983), 6 Ohio St.3d 481, that the commission identify the evidence it relied upon and provide a brief explanation of its reasoning. The commission complied with both requirements. No further explanation is necessary.
 {¶ 19} We further agree with the magistrate's determination that the commission did not abuse its discretion by relying upon Dr. Caston's report. Dr. Caston, as a vocational expert, rendered a vocational assessment of each report. Relying upon State exrel. Eberhardt v. Flxible Corp. (1994), 70 Ohio St.3d 649, andState ex rel. Lopez v. Indus. Comm. (1994), 69 Ohio St.3d 445, relator contends that Dr. Caston's opinion is equivocal and internally inconsistent in light of his deposition and, therefore, may not be relied upon by the commission. The magistrate correctly noted that Dr. Caston properly rendered an assessment of each report and the questions posed during deposition improperly called upon Dr. Caston to give a medical opinion. The commission is the ultimate expert on all vocational matters. The magistrate correctly held that the medical opinion proffered by Dr. Caston in his deposition (1) does not make his report equivocal and internally inconsistent; and (2) is irrelevant to the commission's final determination on relator's claim for PTD.[3]
 {¶ 20} Pursuant to Civ.R. 53(E), we have conducted a full review of the magistrate's decision, relator's arguments and all submitted memoranda. For the reasons stated, relator's objections are overruled and we adopt the magistrate's decision. Relator's request for a writ of mandamus is denied.
Objections overruled; writ of mandamus denied.
Bryant and French, JJ., concur.
 (APPENDIX A) IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. Sharon S. Bray, : :
Relator, : :
v. : No. 05AP-821 :
Hamilton Fixture Company and : (REGULAR CALENDAR) :
Industrial Commission of Ohio, : :
Respondents. : :
 MAGISTRATE'S DECISION Rendered on March 30, 2006 Butkovich, Crosthwaite Gast Co., L.P.A., Joseph A.Butkovich and Robert E. Hof, for relator.
Beirne Wirthlin Co., L.P.A., and Michael J. Schutte, for respondent Hamilton Fixture Co.
Jim Petro, Attorney General, and Sandra E. Pinkerton, for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 21} In this original action, relator, Sharon S. Bray, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying her permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
Findings of Fact:
 {¶ 22} 1. Relator has six industrial claims that arose from her employment with respondent Hamilton Fixture Company ("Hamilton Fixture"), a state-fund employer. Relator was employed as a carpenter assembler with Hamilton Fixture from April 1986 to July 1997. Her most recent injury occurred on May 30, 1997. That injury is allowed for "sprain of wrist, right; sprain right hip; sprain lumbosacral; adjustment disorder with depressed mood," and is assigned claim number 97-408952.
 {¶ 23} 2. Relator was last employed at Hamilton Fixture in July 1997, when she apparently began receiving temporary total disability ("TTD") compensation from the Ohio Bureau of Workers' Compensation ("bureau").
 {¶ 24} 3. On August 20, 2001, at the bureau's request, relator was examined by psychologist Chris H. Modrall, Ph.D. In his report, Dr. Modrall opined that the allowed psychological condition in claim number 97-408952 had reached maximum medical improvement ("MMI"). He further wrote:
* * * Her job positions included ones as a janitor, a ward clerk and an assembler. At the time that she was injured, she was employed by Hamilton Fixture and had been there approximately 11 years. * * *
* * *
* * * I believe that Ms. Bray could return to work from a purely psychological standpoint. Although she complains of problems with memory and concentration, I suspect that these are not so serious that they would interfere with normal workplace performance. If she is able to handle monitoring her father's insulin, then she should be able to complete simple tasks in a work setting. Because of the anxiety, it would be advisable to return [her to] work on a staggered basis. She might work for a few hours the first week, one-half a day the next week and then return full-time, rather than to return full-time on her first day.
 {¶ 25} 4. On September 5, 2001, the bureau moved to terminate TTD compensation. Following an October 15, 2001 hearing, a district hearing officer ("DHO") terminated TTD compensation based in part upon Dr. Modrall's report.
 {¶ 26} 5. On August 1, 2002, relator filed an application for PTD compensation. In support of her application, relator submitted a report, dated July 8, 2002, from psychiatrist Thor Tangvald, M.D., stating:
This report is in reference to Ms. Sharon Bray who has been a patient of Dr. Thor Tangvald and psychotherapist, Dianne DeHaven since 1999. Sharon reported that in May of 1997 she injured her back at work and herniated a disc. This injury rendered Sharon physically disabled to return to employment. Unfortunately, because of a long history of depression, anxiety, and the financial distress caused by her disability[,] Sharon has not been capable of maintaining stable mental health. Sharon currently has been diagnosed with Major Depression, recurrent, moderate severity and Generalized Anxiety Disorder.
It is our strong recommendation that Ms. Bray be considered permanently and totally disabled from returning to any type of employment.
 {¶ 27} 6. On October 18, 2002, at the commission's request, relator was examined by Ron M. Koppenhoefer, M.D., who specializes in physical medicine and rehabilitation. Dr. Koppenhoefer did not examine for the allowed psychological condition. In his narrative report, Dr. Koppenhoefer wrote:
Based on my examination, she would be able to do sedentary/light duty work activities at this time when taking into effect the physical allowed conditions. It is noted that she does have depression, which could interfere with her ability to work. This is being looked into with an additional examination.
 {¶ 28} 7. On a physical strength rating form dated October 18, 2002, Dr. Koppenhoefer indicated that relator is capable of physical work activity described as "sedentary work" and "light work."
 {¶ 29} 8. On November 5, 2002, at the commission's request, relator was examined by psychiatrist Donald L. Brown, M.D. In his narrative report, Dr. Brown wrote:
In my opinion, Mrs. Bray has reached MMI with respect to her previously allowed adjustment disorder with depressed mood and it can be considered permanent. Utilizing the Fourth Edition of the AMA Guides to the Determination of Permanent Impairment, I'd rate her as having a Class III level of impairment. This is a moderate level of impairment. Referencing the percentages from the second edition in the fourth edition, I would rate her level of impairment at 30-33%.
 {¶ 30} 9. Dr. Brown also completed an occupational activity assessment form dated November 8, 2002. On the form, Dr. Brown responded in the affirmative to the following preprinted queries:
Based on the impairment resulting from the allowed/alleged psychiatric/psychological condition(s) only, can this injured worker meet the basic mental/behavioral demands required:
[One] To return to any former position of employment?
[Two] To perform any sustained remunerative employment?
 {¶ 31} 10. On April 8, 2003, relator, through counsel, deposed Dr. Brown. The deposition was recorded and transcribed for the record.
 {¶ 32} 11. The commission requested an employability assessment report from Howard L. Caston, Ph.D., a vocational expert. In his report, dated December 20, 2002, Dr. Caston responded to the following query:
Based on your separate consideration of reviewed medical and psychological opinions regarding functional limitations which arise from the allowed condition(s), identify occupations which the claimant may reasonable [sic] be expected to perform, (A) immediately and/or (B) following appropriate academic remediation, or brief skill training.
 {¶ 33} Indicating acceptance of Dr. Modrall's report for purposes of his vocational assessment, Dr. Caston listed the following employment options that relator can perform immediately:
Carpenter assembler, circuit board assembler, window screen assembler, receiving clerk, credit clerk, ward clerk, inspector, cashier, packer, toy assembler, sales clerk, cashier, telephone receptionist, telephone operator, receptionist, office clerk, file clerk, engraver machine operator, polisher, embossing press operator, laboratory clerk, credit clerk, accounting clerk, router, salad maker, weight tester, heat curer, paper cutter, end frazer, folder, spinner, inspector II, pompom maker, assembler-fishing floats.
 {¶ 34} Indicating acceptance of Dr. Brown's report for purposes of his vocational assessment, Dr. Caston listed the same employment options listed for Dr. Modrall's report.
 {¶ 35} Indicating acceptance of Dr. Koppenhoefer's report for purposes of his vocational assessment, Dr. Caston listed the following employment options that can be performed immediately:
Receiving clerk, credit clerk, ward clerk, inspector, cashier, packer, toy assembler, sales clerk, cashier, telephone receptionist, telephone operator, receptionist, office clerk, file clerk, engraver machine operator, polisher, embossing press operator, laboratory clerk, credit clerk, accounting clerk, router, salad maker, weight tester, heat curer, paper cutter, end frazer, folder, spinner, inspector II pompom maker, assembler-fishing floats.
 {¶ 36} Under "Effects of Other Employability Factors," Dr. Caston wrote:
[One] Question: How, if at all, do the claimant's age, education, work history or other factors (physical, psychological and sociological) affect his/her ability to meet basic demands of entry level occupations?
Answer: Age: 53 Should not be a factor that would affect functional capacities.
Education: Twelfth grade. Should be adequate for many entry level, sedentary and light jobs.
Work History: Prior [occupations] have given this individual some skills that are related and useful in other less strenuous and less stressful occupations.
* * *
[Two] Question: Does your review of background data indicate whether the claimant may reasonably develop academic or other skills required to perform entry level Sedentary or Light jobs?
Answer: There is no basis to find incapacity for academic remediation to seventh/eighth grade level.
[Three] Question: Are there significant issues regarding potential employability limitations or strengths which you wish to call to the SHO's attention?
Answer: This individual should be able to adjust to clerical occupations based on her work history.
Under "Employability Assessment Database," Dr. Caston wrote:
 WORK HISTORY JOB TITLE * * * SKILL STRENGTH DATES LEVEL LEVEL
 Carpenter assembler * * * Semi-Skilled Heavy 4/86-7/97
 Circuit board assembler * * * Semi-skilled Light 1985-1986
Assembler * * * Semi-skilled Medium 1974-1976
 Receiving clerk * * * Semi-skilled Medium 1973-1974
Credit clerk * * * Semi-skilled Sedentary 1969-1970
Ward clerk * * * Semi-skilled Light 1971
 {¶ 37} 12. On March 3, 2003, relator, through counsel, deposed Dr. Caston. The deposition was recorded and transcribed for the record.
 {¶ 38} 13. Following a July 10, 2003 hearing, a staff hearing officer ("SHO") issued an order denying relator's PTD application. The SHO's order states in part:
* * * This order is based upon the reports of Dr. Modrall, Dr. Koppenhoefer, and Dr. Caston.
* * *
Dr. Ron Koppenhoefer, Physical Medicine and Rehabilitation, examined the injured worker on 10/18/2002 at the request of the Industrial Commission. Dr. Koppenhoefer examined the injured worker with regard to the orthopedic conditions that are recognized in her various claims. * * * Dr. Koppenhoefer opined that the injured worker would be capable of performing sedentary or light work activities when considering the allowed conditions. On the Physical Strengths Rating Form that is attached to his report[,] Dr. Koppenhoefer indicated that the injured worker is capable of physical work activity which is defined as sedentary or light work.
Dr. Chris Modrall, Ph.D., evaluated the injured worker for the psychiatric/psychological condition that is recognized in claim number 97-408952 on 08/20/2001. * * * Dr. Modrall opined that the injured worker could return to work from a purely psychological standpoint. He further advised that although the injured worker complains of problems with memory and concentration, he did not feel that these problems are so serious that they would interfere with normal workplace performances.
The Staff Hearing Officer finds that the injured worker's condition has reached maximum medical improvement. The Staff Hearing Officer further finds, based upon the reports of Dr. Koppenhoefer and Dr. Modrall that the injured worker retains the physical functional capacity to perform employment activities which are sedentary to light in nature.
* * *
The Staff Hearing Officer finds that the injured worker is 53 years of age with a high school education and a work history which involves employment as a carpenter assembler, a circuit board assembler, a receiving clerk, an assembler, a credit clerk, and a ward clerk. The Staff Hearing Officer further finds that the injured worker has no special vocational training. The Staff Hearing Officer further finds that the injured worker is able to read, write, and perform basic math.
The Staff Hearing Officer finds that the injured worker's age of 53 years is a mild barrier to the injured worker with regard to her ability to return to work. The Staff Hearing Officer further finds, however, that age alone is never a factor which prevents a person from returning to work. The Staff Hearing Officer further finds that the injured worker's high school education and ability to read, write, and perform basic math well are assets to the injured worker with regard to her ability to return to work. The Staff Hearing Officer further finds that the fact that the injured worker has performed semi-skilled employment activities in the past is evidence that the injured worker would be able to learn to perform semi-skilled employment activities in the future. The Staff Hearing Officer further finds that the injured worker's high school education and ability to read, write and perform basic math would be assets to the injured worker with regard to her ability to learn the new work rules, work skills and work procedures necessary to perform other types of employment. The Staff Hearing Officer further finds based upon the reports of Dr. Modrall and Dr. Koppenhoefer, that the injured worker retains the physical functional capacity to perform employment activities which are sedentary to light in nature. The Staff Hearing Officer further finds that there is no basis for determining that the injured worker would not be able to develop the skills to perform some other type of employment. The Staff Hearing Officer further finds that the injured worker's work history has provided her with some skills that are transferable to the performance of lighter duty work. The Staff Hearing Officer further finds that although the injured worker has not worked in the last six years, the injured worker has not involved herself in any program of rehabilitation or remediation designed to improve or enhance her ability to return to work. The Staff Hearing Officer further finds that the injured worker is able to perform the following jobs immediately: receiving clerk, credit credit [sic], ward clerk, inspector, cashier, packer, toy assembler, sales clerk, cashier, telephone receptionist, telephone operator, receptionist, office clerk, file clerk, engraver machine operator, polisher, embossing press operator, laboratory clerk, credit clerk, accounting clerk, router, salad maker, weight tester, heat curer, paper cutter, end frazer, folder, spinner, inspector II, pom pom maker, assembler-fishing floats. The Staff Hearing Officer further finds that the injured worker does not need remediation to return to work. The Staff Hearing Officer therefore finds that the injured worker is capable of performing sustained remunerative employment and is not permanently and totally disabled. Injured worker's Application for Permanent and Total Disability, filed 08/01/2002, is therefore denied.
 {¶ 39} 14. On September 10, 2003, the commission mailed an order denying relator's request for reconsideration of the SHO's order of July 10, 2003.
 {¶ 40} 15. On August 8, 2005, relator, Sharon S. Bray, filed this mandamus action.
Conclusions of Law:
 {¶ 41} Three issues are presented: (1) Is Dr. Modrall's report some evidence upon which the commission can rely in a PTD determination when the report was generated by the bureau's concern over relator's continued entitlement to TTD compensation? (2) Was the commission required to explain why it relied upon Dr. Modrall's report to the exclusion of other reports? and (3) Did the commission abuse its discretion by relying in part upon Dr. Caston's report?
 {¶ 42} The magistrate finds: (1) Dr. Modrall's report is some evidence upon which the commission can rely even though it was generated by the bureau's concern over relator's continued entitlement to TTD compensation; (2) the commission was not required to explain why it relied upon Dr. Modrall's report to the exclusion of other reports; and (3) the commission did not abuse its discretion by relying in part upon Dr. Caston's report.
 {¶ 43} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 44} Turning to the first issue, Ohio Adm. Code 4121-3-34
sets forth the commission's rules applicable to adjudication of PTD applications. Ohio Adm. Code 4121-3-34(D) sets forth the commission's guidelines for adjudication of PTD applications.
 {¶ 45} Ohio Adm. Code 4121-3-34(D)(1)(c) states:
If, after hearing, the adjudicator finds that the injured worker is medically able to return to the former position of employment, the injured worker shall be found not to be permanently and totally disabled.
 {¶ 46} In his report, Dr. Modrall finds that "Ms. Bray could return to work from a purely psychological standpoint." Earlier in his report, Dr. Modrall acknowledges that relator was employed as an "assembler" which is an apparent reference to the job that relator worked at the time of her injury. Thus, the inference to be drawn is that the psychological claim allowance does not prevent a return to her former position of employment. Of course, Dr. Modrall's opinion encompasses more than the former position of employment. In effect, Dr. Modrall opined that the psychological claim allowance is not at all work prohibitive.
 {¶ 47} Contrary to relator's suggestion here, medical evidence of an ability to return to the former position of employment — evidence that can bar TTD compensation — can also bar PTD compensation. See State ex rel. Speelman v. Indus.Comm. (1992), 73 Ohio App.3d 757, 762.
 {¶ 48} Relator's reliance upon State ex rel. Kaska v. Indus.Comm. (1992), 63 Ohio St.3d 743, is misplaced. In Kaska, it was held that a prior permanent partial disability award does not preclude later receipt of TTD compensation. The Kaska court rejected the argument that the "permanency" element of a permanent partial disability award is sufficient to preclude receipt of TTD compensation. The court reasoned that the word "permanent" as used in former R.C. 4123.57 does not have the same meaning as that term is used in State ex rel. Ramirez v. Indus.Comm. (1982), 69 Ohio St.2d 630. (Ramirez permanency is now equatable with the concept of MMI.) The Kaska court further noted that unlike "permanency," which is a precondition to receipt of permanent partial benefits, TTD "permanency" is a termination criteria.
 {¶ 49} It would necessarily follow from the Kaska court's analysis that a doctor's opinion as to a claimant's percentage of permanent partial disability cannot be deemed evidence that the claimant has reached MMI for purposes of TTD.
 {¶ 50} Apparently, relator interprets Kaska to hold that "when physicians examine expressly for the purpose of assessing permanent partial disability, their reports do not support the denial of temporary total disability compensation." (Relator's brief, at 7.) However, that is not an accurate statement ofKaska's holding.
 {¶ 51} Moreover, relator seems to infer, incorrectly, from his misstatement of the holding in Kaska, that Kaska supports the much broader proposition that when a physician examines expressly for the purpose of assessing entitlement to one type of compensation, his report cannot be used as evidence regarding entitlement to another type of compensation. That much broader proposition suggested by relator cannot be inferred from Kaska,
nor from any other workers' compensation case that this magistrate has read.
 {¶ 52} In short, relator's reliance upon Kaska is misplaced. To reiterate, that the purpose of Dr. Modrall's examination was to obtain medical evidence as to issues related to continued entitlement to TTD compensation, does not prevent the report from being used to support issues relating to PTD compensation.
 {¶ 53} In State ex rel. Bell v. Indus. Comm. (1995),72 Ohio St.3d 575, the court succinctly set forth the law applicable to the second issue that relator presents here. In Bell, the injured worker brought a mandamus action challenging the commission's denial of his PTD application. The Bell court wrote:
Claimant also suggests that, henceforth, all commission orders be made to set forth the reasons for finding one report more persuasive than another. Claimant's argument, as a broad proposition, is weakened by State ex rel. Mitchell v. Robbins Myers, Inc. (1984), 6 Ohio St.3d 481, * * * and [State ex rel.Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203]. Noll requires only a brief explanation of the commission's reasoning.Mitchell instructs the commission to list in its orders the evidence on which it relied. Moreover, later decisions have stressed that a reviewing court is not aided by a recitation of evidence that was considered but not found persuasive. See,e.g., State ex rel. DeMint v. Indus. Comm. (1990), 49 Ohio St.3d 19[.] * * * Logic dictates that if the identity of rejected evidence is irrelevant, so is the reason for rejection.
Id. at 577-578. (Emphasis sic.)
 {¶ 54} Here, relator argues:
* * * While it is within the Hearing Officer's discretion to rely on one report over another, there is overwhelming weight and a consensus between the other reports of Dr. Tangvald, Dr. Stoeckel, and Dr. Brown, all of which were performed for the purpose of permanent total disability compensation[.] * * * Dr. Modrall's report was dated almost one year prior to the Relator even filing for permanent and total disability compensation and did not consider whether Relator was capable of returning to any type of sustained remunerative employment[.] * * * Because of overwhelming evidence contrary of Dr. Modrall's report, the Hearing Officer is required to explain why the reports intended for the purpose of determining permanent and total disability compensation were rejected, in lieu of Dr. Modrall's report[.] * * *
(Relator's brief, at 9-10.)
 {¶ 55} Relator's argument lacks merit in light of Bell.
Clearly, the volume of other evidence that might be argued to contradict the specific evidence relied upon by the commission is irrelevant. It is the commission that weighs the evidence, not this court. The commission need not explain how it weighed the medical evidence before it. Bell.
 {¶ 56} As previously noted, the third issue is whether the commission abused its discretion by relying in part on Dr. Caston's report.
 {¶ 57} Relator seems to have misunderstood Dr. Caston's employability assessment report when relator argues:
In his deposition, dated March 3, 2003, Dr. Caston contradicted his opinion that the Relator could return to her former position of employment when he testified that the job of carpet [sic] assembler was a heavy job[.] * * * This negated and contradicted his earlier opinion that the Relator could return to her former position of employment[.] * * *
(Relator's brief, at 14.)
 {¶ 58} To begin, the above argument seems to suggest incorrectly that Dr. Caston is a medical expert, rather than a vocational expert. Obviously, as a vocational expert, Dr. Caston cannot render a medical opinion. In his report, Dr. Caston indicates that the "carpenter assembler" job was performed at the heavy strength level. In his report, Dr. Caston opines that relator can perform the "carpenter assembler" job, i.e., the former position of employment, based upon Dr. Modrall's psychological opinion. Dr. Caston also lists employment options that fit Dr. Koppenhoefer's opinion that the allowed physical conditions permit sedentary and light-duty work.
 {¶ 59} Contrary to relator's assertion, Dr. Caston's deposition testimony, that the carpenter assembler job was at the heavy strength level, simply reiterates information in his report.
 {¶ 60} Clearly, Dr. Caston's deposition statement that the job of carpenter assembler was performed at the heavy strength level does not negate or contradict Dr. Caston's report in any way. There is simply no inconsistency or contradiction in the proposition that relator can return to her former position of employment as a "carpenter assembler" based solely on a psychological claim allowance, but is limited to sedentary and light work based upon the allowed physical restrictions.
 {¶ 61} During Dr. Caston's deposition, the following exchange occurred:
[Relator's Counsel]: The claimant in this particular case, Doctor, has alleged in a lot of the medical reports in the file, as well as some of the reports that you actually have reviewed, a lot of somatic complaints, depression and anxiety, difficulty coping with life stressors, social withdrawal, loss of interest, feelings of hopelessness, uselessness, kind of reclusive behavior, chronic pain, feeling of uncertainty, inadequacies.
If those type of complaints and symptoms are true and accurate, Doctor, based on the claimant's testimony and based on what she's told her doctors, would those have an impact on her ability to perform the jobs that you've listed?
[Dr. Caston]: Yes.
Q. Will she be able to perform any of the jobs?
A. It's doubtful.
 {¶ 62} Counsel's question to Dr. Caston was improper. The question, in effect, asked Dr. Caston to render a medical opinion as to relator's ability to work based upon an assumption of the accuracy of stated symptoms.
 {¶ 63} As a vocational expert, it was Dr. Caston's duty to accept the psychological and medical reports as given and to render his vocational analysis with respect to each report.
 {¶ 64} As previously noted, it was Dr. Modrall's opinion that relator "could return to work from a purely psychological standpoint." Dr. Caston was required to accept Dr. Modrall's opinion as given and to render a vocational analysis on that basis.
 {¶ 65} Thus, the question posed by relator's counsel at the deposition produced an answer from Dr. Caston that is irrelevant to the PTD adjudication.
 {¶ 66} Here, relator attempts to argue, based upon the above-quoted deposition testimony, that Dr. Caston's deposition testimony contradicts his vocational report.
 {¶ 67} Citing State ex rel. Eberhardt v. Flxible Corp.
(1994), 70 Ohio St.3d 649, relator contends that Dr. Caston's report and deposition have produced equivocal opinions. CitingState ex rel. Lopez v. Indus. Comm. (1994), 69 Ohio St.3d 445, relator contends that Dr. Caston's report and his deposition are "internally inconsistent." As the above analysis shows, relator's contentions lack merit.
 {¶ 68} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
[1] A deposition of Dr. Brown was conducted on April 8, 2003.
[2] A deposition of Dr. Caston was conducted on March 3, 2003.
[3] We further note that the equivocal opinions at issue inEberhardt and Lopez were medical opinions, not vocational.